Case number 23-1797 from Western Missouri, Michael Hill v. Denis McDonough. Ms. Randles. Good morning.  May it please the court. The Kansas City Veterans Administration does have a sordid history of discrimination against African American and disabled workers. From being called racist tropes, such as boy, nappy headed, black bitch, the N word, to discrimination in the manner in which work is handed out, discipline, leave, telework, and accommodations are doled. African American employees face obstacles in employment that others do not. Michael Hill appeals from the grant of summary judgment on his claims against the Veterans Administration for race, age, sex, and disability discrimination and retaliation. The persistent racist tropes, racial slurs, the constant monitoring, stripping away of job duties, placing him in a performance improvement plan, and after the PIP, a job counseling, and other similar actions over the course of two years were sufficiently severe and pervasive to form the basis of a harassment and retaliatory harassment claims. Plaintiff has established all of the facts necessary for a prima facie case of disparate treatment and retaliation based on age, race, sex, and disability. It seems to me that almost all your briefing was directed to race. I really had trouble seeing where you were making much of an argument about disability or maybe even age. We made no argument regarding age or disability because the summary judgment motion was established by the defendants. Defendants never raised age or disability discrimination in the course of their summary judgment motion. But the court granted summary judgment, right? The court granted summary judgment on those two issues as well, even though they were never raised in the discussions. That's because the wrong statutes are cited below, right? Well, I cited at the beginning in the jurisdictional statement of the complaint, we stated that there was a federal question under 1331 and also that it was under Title VII. However, the remainder of the petition also establishes that there was race, age, and disability under each of the complaints. What's more, those were fully exhausted at the administrative level. Those were fully investigated. They're part of the report of investigation, and so there's no question. Did you move for reconsideration on this ground? I did not move for reconsideration on this ground. I probably should have. That's right. I mean, there's nothing that prevents a district court from finding a different reason to decide a case than precisely what was argued by the parties. That's true, but not a completely different ground. If you're the victim of that, you have to go back and say, Judge, they didn't argue that, and I have a response. Well, the judge in the order itself indicates that neither party had raised age or disability and then granted summary judgment. Under that circumstance, especially considering the Eighth Law precedent, we believe that it would be without any, it would be a nullity to go back in front of the judge and say, Judge, you said that no one raised the issue, and here's the case that says it's inappropriate for you to proceed this way. I mean, to Judge Loken's point, that's the absolutely perfect time for a motion for reconsideration. Yes, and if hindsight were 20-20, I would go back and I would ask for the reconsideration. However, we believed at the time, and I still believe that it's also appropriate to bring this to the appellate courts, because the judge recognized that there were no arguments regarding age or disability by the defense counsel when they filed their motion for summary judgment. In that instance, she went ahead and issued summary judgment. But the judge decided on a matter of law. I'm sorry? The judge decided as a matter of law, Title VII doesn't cover this. There were no facts whatsoever that were presented because defense counsel didn't even raise it. That wasn't the decision. It's that those claims, even if made and argued, aren't covered by this statute. Well, that's true. However, there's nothing that tells us that in the complaint you have to designate exactly which statute you're going under for each of the allegations. Well, that's very debatable. The allegations themselves establish without doubt that this was a case... constitutional proposition. The judge can say, you know, you haven't stated a claim. I don't even know what it is. And I understand that perhaps we should have put in specifically that we were under the ADEA as well as the ADA. It might help to cite that statute. Yes, it would help. However... If it's not cited and I'm the judge, it's not in my case. But, Your Honor, I think that we have to look at the totality of the petition under the Eighth Circuit law. What's the best case for your proposition that we can do this when it wasn't preserved and the district judge was not given an opportunity to consider whether to correct an alleged error? The best case is the Heisler v. Metro Council case and the Walker v. Missouri Department of Corrections case. I can't understand. I'm not... You're not articulating well enough for my hearing. I'm sorry. Say it again. The best cases are Heisler, H-E-I-S-L-E-R, v. Metro Council, as well as the Walker v. Missouri Department of Corrections case. Thank you. Let me ask you another question going to the hostile work environment. Yes. You seem to be arguing that under our current standard, you may not be able to get over that hurdle. And if I'm reading your brief correctly, what you're really arguing is that we... that the Eighth Circuit's out of step with all the other circuits or isn't consistent with Title VII employment discrimination law and that we should revisit the standard. Is that your argument? I have two responses to that. The first is I do believe that the amount of discrimination and harassment that occurred would meet the Eighth Circuit standard as it currently exists. But I also believe that the Eighth Circuit is out of step with what the other circuits are doing because there have been cases, and there was a long side in the brief regarding one of the lower court district court cases about how difficult it is to raise a harassment claim in the Eighth Circuit because even cases where there are consistent... For future reference, we can't do anything about that. You should preserve it in the brief and just say, I'm preserving this for in-bank review and then make the first argument, which we do have jurisdiction and authority to review. I did make the first argument in the briefing indicating that because my client was... But now you want to argue again how we're out of step this morning. We can't do anything about that. It's our step. With respect, Your Honor, Judge Malloy asked me if I had raised in the briefing that we were... Yes, because he was about to say that's for the in-bank court. And we would love to have that hearing in front of the in-bank court. Well, you'd rather win on the first issue, wouldn't you? I would rather win on the first issue, Your Honor. That's what we're here to listen to. All right. So we believe that our client faced four years of being called boy on a nearly daily basis. The harassment was severe. It was pervasive. And we believe that a jury should have the right to listen to all of the evidence that establishes how severe and how pervasive it was. We believe that the court attempted to place its own judgment over that of a jury with regard to the severe pervasiveness of the harassment that went on. Our client testified that he was called boy on a nearly constant basis. He also testified that he saw and heard others who were using the same kind of racial epithets toward other individuals, which is also actionable under the Eighth Circuit law. He also indicated that he was denied training, that he was given other work that Caucasians weren't, but more significantly, he and the other African American, because there were only two in the entire division, were singled out. They were brought in to meetings, and at the meetings they were referred to as lazy and as dumb. And the way the manager would do that is she would stand behind them, behind Michael Hill particularly, as she said, don't let these people use you to manipulate you into doing their job. She also said, and if they come to you, just keep telling them and telling them and telling them until they finally get it, and if they don't get it, then I'll deal with it then. Indicating that they were both lazy and that they were stupid, using a racist trope during the whole time that they're in front of these meetings. Further, any time there was an error, which in accounting does occur regularly, that's why they have division of labor where there are two people overviewing everything that occurs in there. Because of that, she would, any time she found anything wrong with Michael Hill, she would call in the entire division, she would point out the error that he made, and then she would call the supervisor, Mr. Medved, down to look at the error that he had made. I thought it was observed that in his deposition he couldn't pinpoint the context for these various you people type things. No, the you people type thing, there was, that's two separate pieces of the deposition. In the one piece, he's pinpointing that at the meetings that they held in his division where they were talking about you people, she was standing directly behind him, gesturing to him and making faces at him as she was making these comments. That would indicate that she was directing it at the only African American in the room, or he and when later Sondra came, Sonia rather, when Sonia came, the two African Americans in the room, she would stand behind them at those specific meetings. There were other instances where he was saying that he couldn't specify the date or the time that those kinds of things occurred, just that he had seen them occur. So we're talking about two different pieces of the record when we talk about that piece. Let me ask you this. Was it 2018 that he entered into the settlement with the VA over his claims of racial discrimination? It was 2015 that he entered into a settlement with the VA. Do you believe that any evidence of incidents that occurred prior to the settlement are relevant in this case? Can they be considered in this case since they were settled? Well, I believe they can be considered as evidence in the case, not necessarily as evidence that can be relied upon for receiving compensation. But the reason they can be considered as evidence is because the very same types of discrimination continue to occur even after the 2015 settlement. And so between 2015 and 2018, we had the exact same kinds of things going on that we had prior to 2015. In that circumstance, because it's the same type of discrimination that's just carried on through to the end, then the prior information can be looked at as evidence that there's an ongoing racist issue at the VA. And unless there are other questions, I'd like to reserve the remaining time for rebuttal. Well, on this unacceptable job performance and the PIP issue. Yes. What's your best case that a PIP and when there's no improvement, some corrective counseling, that that's an adverse action? Well, we made a copying error in the summary judgment that I didn't catch until the judge pointed out that there was a copying error. And so the collective bargaining agreement actually says, and it's quoted in this briefing what it actually says, that if you get to the point of a. . . That wasn't my question. My question was a case where PIP has been an adverse action. All the cases I've seen, that's the way an employer is supposed to do progressive discipline. Yes, but the next progression is termination. And that's where we were headed with Michael Hill. Yes, if you don't improve, that's always where it's headed. Yes. By definition, where it's headed. Exactly. But then he received a job counseling after the PIP to indicate that he was not. . . Can you tell me what cases you have where PIP, this progression, has been found to be an adverse action? I have not found a case that says a PIP standing alone is an adverse action. And that's not our argument. Our argument is that a PIP. . . The PIP under the collective bargaining agreement as it stands with the VA is an adverse job action. And that's because it rests on the CBA. Now, we made a copying error in the CBA. What? The collective bargaining agreement. It's an ad because they didn't follow the policy or the CBA? The collective bargaining agreement specifically identifies a PIP as an adverse job action. Oh, heavens. You're saying that's controlling as law? Boy, you better have a case on that one. Well, I'm not saying that the law says that a PIP is an adverse job action. I'm saying that the VA defines a PIP as an adverse job action. We have a lot of cases that say employer policies don't drive this train. What case says a CBA does? Well, it's not the CBA. It's how it is enforced. And it's the enforcement mechanism that creates the adverse job action. So is there a case, though? We don't have a case that says a PIP standing alone. But we do have cases that say. . . You have a case saying a PIP plus a CBA. We don't have a case saying a PIP plus a CBA. We say a PIP in the greater context. Then what case is that? I'll have to get that for you. But there are cases, and we've listed them in our briefing. Probably your closest one is one I tried, Kim v. Nash Finch. Yes. I was the trial judge in that case. Yes. So I know it very well. And I think that's probably the case that I was thinking of. Thank you, Your Honor. Thank you, Your Honor. Good morning. May it please the Court. Elizabeth Padding for Dennis McDonough. Starting with the issue of the performance improvement plan, as Your Honors have noted, there is no case law in the Eighth Circuit or elsewhere that suggests that a PIP standing alone would constitute an actionable adverse action. So she's not saying it's standing alone. Well, and to go on to the CBA content, Your Honor, the first issue as opposing counsel has noted is that that portion of the CBA that she's relying on to make this argument does not appear in the record. Additionally, even if that page of the document were included. A PIP is part of a progression, a disciplinary progression. Correct. So it's never standing alone. It's always heading somewhere. Yes. And so the question is. Is the employer giving the employee whose job performance is in doubt an opportunity to get back on the beam? Yes, Your Honor. And that's, in fact, what the CBA says. How can that ever be adverse action? Well, it can't. And I think that's the problem with the argument that's being raised. And so I think the contention that they're attempting to make is that the PIP in and of itself mandated subsequent termination. And that's simply not what the CBA says, regardless of whether it's. . . Well, it was a failure to improve after the two months. That's a kind of standard to PIP, that then you have a performance review of how you're doing under the PIP. And if you haven't improved, things get more threatening, if you will. Correct, Your Honor. And so we have to get to that point of what happens after the PIP. But here we never got there because. . . Well, we got through the PIP. That's not true. We got through the PIP. There was a subsequent counseling. But before there was any follow-through to say, has Mr. Hill sufficiently improved to make the determination of whether he was going to go back to a fully successful. . . He has a medical leave. Correct. Right after the start of the performance. Exactly, Your Honor. That's sort of neutral. Well, he goes on medical leave and then he quits. And so there's no adverse action here because. . . That's in dispute. Well. . . That's your view of the facts. Correct. But, Your Honor, I think when the facts are looked at in totality, what happens is Mr. Hill goes out on medical leave in February. At the end of May, he asks his supervisors, can I come into the office and give you an update on how I'm doing and say hi to everybody. And when he shows up for that meeting, he tenders his resignation. And so certainly. . . Now you're talking about something that your opposing counsel left to the briefs. So I'm going to have to allow some rebuttal time because you've opened that door. I apologize, Your Honor. Not uncommon. Not always the best thing to do. All right. So what about this fact that you never moved for. . . I don't mean you personally. The agency didn't move for summary judgment on age and disability and the claim that the plaintiff here was caught off guard. Your Honor, that's just. . . Because there is case law out there that suggests that the district court should not or cannot be moving for summary judgment on grounds that were not presented in a motion. Absolutely. The issue here is that, yes, the agency did seek summary judgment on the age and disability claims. And the areas where that summary judgment was sought on those claims is cited in the government's brief on appeal. And, for example, one of the pages, the appendix page 58, is just a piece of that discussion.  It's throughout the analysis. The agency sought summary judgment under the ADEA and under the Rehab Act on the age and disability claims. What the district court did was decide that it was unnecessary to reach the substance of those claims because the plaintiff had failed to properly plead them and identify Title VII as the sole basis under which she was seeking summary judgment. So the district court opted not to reach the merits. However, even if this court were to determine that the district court should not have disposed of the claims based on the failure to plead them, which admittedly was an issue that the government did not raise in its summary judgment motion, Dick v. Dickinson State University says that this court can affirm on any ground. And here, there is simply no evidence to support the claim of age or disability discrimination. The only time that age discrimination was referenced in the plaintiff's brief in opposition to summary judgment was when Mr. Hill referred to himself as a black male over age 40, thereby putting him into the class of people who could, in theory, make an age discrimination complaint. The only evidence raised with respect to the disability discrimination claim is when his supervisor asked for some able-bodied people to move some boxes, which I think number one suggests that she was not asking Mr. Hill to do anything that he wasn't capable of doing. But number two, an offhand remark like that, especially without being tied to any sort of adverse action, is certainly not evidence to allow a plaintiff to proceed to trial on a disability discrimination claim. So here, I think there are two separate bases on which this court could affirm. Number one is the failure to plead, and number two is, on the merits, there's simply no evidence. And again, it was certainly raised by the VA in the summary judgment briefing. With respect to the harassment claims, there are repeated arguments throughout the briefing about this general discriminatory environment that Mr. Hill claims existed at the VA. There's reference to the N-word and different slurs being used, but critically, none of the egregious claims that are being made about this purported environment are supported by the actual evidence in this case. So when the court goes and looks at the deposition testimony, Mr. Hill's unsworn declaration that was submitted in support of the summary judgment motion, which, as a side note, the court decided not to even consider because it wasn't sworn and wasn't competent evidence. And then Mr. Hill's affidavit that was submitted in support of another plaintiff's claim. The only claims being made about this purportedly hostile work environment and the language being used are references to the term boy, the term nappy-headed, and then these people or you people type of references. So the law that the plaintiff is citing, or that Mr. Hill is citing with respect to these other circuits and the use of racial slurs, none of those cases, regardless of this court's precedent, are analogous to what we're dealing with here because there aren't claims being made and there's not evidence to support this hostile working environment that's being referenced against and support in the briefing. Additionally, one more side note on that claim, the cases being cited are not inconsistent with this court's precedent on what constitutes a hostile working environment. This court's precedent is very clear that whether a hostile working environment exists depends on the specific facts of the case. And there is no precedent that says that inherently the use of one horrible slur or one heinous incident would not be sufficient to maintain a hostile working environment claim. So there is no disconnect in the law to begin with, but regardless of the law we're looking at, there just are not facts here to support the existence of a hostile working environment. What about if he's aware of a hostile work environment and there's only one or two incidents specifically addressed of him, are you saying even though he has this awareness that these racial slurs are being used against other people, that that's irrelevant to his claim? Your Honor, I think in some world potentially it would be relevant. Here, I don't believe it is. Number one, because you referenced in a question to my opposing counsel, the settlement agreement. The settlement agreement was signed in the middle of 2017 and it resolved all claims prior to that date. Your counsel said 2015. I thought it was later than 2015. Yes. It's 2017? I believe it's May of 2017. And so anything occurring prior to that is completely disposed of. Even if we look at the declarations and evidence that is being cited. I would say that very confidently. I don't think it's necessarily true in cases like Morgan, ongoing, continuing problems. Well, Your Honor, I think this... Counsel said it's relevant. It's background. It's background. That's correct. All right. Well, then we're talking about summary judgment. She doesn't get to tell a jury about this background. That's the issue. Your Honor, I think if there were evidence of a hostile working environment following 2017, if there was evidence there for this case to go to the jury, then there would be evidential... Well, his testimony is evidence. Right, but the issue... You're talking about he didn't corroborate it enough to your client's satisfaction. It's not even necessarily that it's not corroborated. The problem is that they're just base allegations with no supporting detail or facts. So in his... They're not allegations. They're testimonies. Well, we're... It's not avert or verified? The declaration is not verified. It's not under penalty of perjury, and that's where most of it's coming from. But even with respect to the testimony in his deposition, he references, for example, use of the term boy, but there's no specificity on who was making these statements. Other than it's pretty clear it wasn't supervisors, at least after the settlement agreement was entered. It was primarily the plaintiff's deposition that was taken, and then there's the administrative record from the EEOC proceedings. And this other black co-worker, there's nothing... Plaintiff didn't submit any affidavit or...? Your Honor, I believe she submitted an affidavit in conjunction with the EEO proceeding, but she wasn't deposed and she didn't submit a separate affidavit. I will also note with respect... What did she say in that, in the EEO? No substantive facts that bear on any of this. She didn't say, I've never heard boy around the workplace? No, she didn't. It's my recollection of... No, did she say, I have heard boy? She did not say that she has heard boy. Certainly not. I mean, where the allegations... Maybe you should have deposed her. Your Honor, the plaintiff, I should have deposed her if that evidence was critical because she's the one who has... The plaintiff doesn't have to take depositions of its own witness. Well, no, Your Honor, but the plaintiff is the one who has the burden in opposing summary judgment to come forward with facts that would allow a submissible case to be made at trial. And so here, the facts simply don't exist. Was the complaint verified? I don't believe so, Your Honor. Throughout the deposition testimony and throughout the unverified affidavit, I mean, there are references to the use of the term boy, but again, without a timeframe put on them, there's no evidence or basis to conclude that this term was used after the 2017 settlement agreement was signed and these claims were disposed of. And there's no evidence that suggests that any supervisor was using any type of terms like boy or any other type of potential racial slur. So to the extent language like that was being used by Mr. Hill's co-workers to maintain the hostile work environment claim, the plaintiff would have to meet the standard for co-worker harassment, which would include that the VA was aware... Why do you say that? I mean, I doubt that's right. I'm sorry, Your Honor. That argument doesn't get you summary judgment. Well, there are two issues here and two reasons why I think it does. If there was anything in the record that supported the notion that what went on in the meetings, such as a supervisor standing behind him and making faces and gestures... And, Your Honor, actually... That co-worker harassment is... No, but the deposition transcript in that Mr. Hill specifically acknowledged that when his supervisor was standing behind him and using the phrases those people or you people, he had no idea. He couldn't see her. He didn't know if she was pointing at him. The contention that she was pointing at him or saying it in reference to him is unsupportive. I thought she did it when the co-worker was the subject. No, Your Honor. The testimony and the evidence is there were group meetings and the phrases you people or those people were uttered in some form. But there are pages of deposition testimony where Mr. Hill is asked what the context... Okay, but I thought... There's all kinds of ways for a supervisor to convey disapproval with or without bad words. Yes, Your Honor, but the problem here is there is no context. The testimony from Mr. Hill was it does not matter what the context of this language is. He believes you people or those people in any context is inherently discriminatory. And there's simply no legal support for that. And under the Twyman case, citing throughout the VA's briefing, that case provides that facially race-neutral statements without more aren't sufficient to show animus. Here, the record and the evidence submitted simply provides no evidence to support the plaintiff being able to proceed to trial on any of the claims raised. And I ask this court to affirm the district court's finding. Thank you. I'll give you a minute for rebuttal. Thank you, Your Honor. The most important issue that I think that needs to be discussed here is the issue that the court, when she issued summary judgment against the plaintiff, she very succinctly broke apart each and all of the claims. But she only considered the harassment by the supervisors when she was looking at the harassment claim. If you look at the language of the order, she keeps talking about the supervisory harassment. Plaintiff raised sufficient claims, and there was sufficient notice on behalf of the agency for co-worker harassment as well. It was many of the co-workers who were making the comments about Boye. And when the commentary about his, the degrees that he'd gotten, that this was cross burning ideas. Did you argue that in the briefing? The co-worker harassment cases, the pair of Supreme Court cases that kind of changed that world? Yes. Yes. Farragher and those are quoted in the pleadings. And so we believe that the... In the pleadings or in the briefing? In the briefing. I'm sorry. We believe that the court inappropriately divided out the types of claims in order to grant summary judgment to the plaintiff, to the defendant. Thank you, counsel. The case has been thoroughly briefed and the argument's been helpful. We will take it under advisement.